UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF LOUISIANA

IN RE:     MADLEN R. RAINES

CASE NO:   09-50388



*************************************************************************

## MEMORANDUM IN OPPOSITION TO DEBTOR'S OBJECTION TO CLAIM NUMBER SIX

NOW INTO COURT, through undersigned counsel, comes CHARLES GOSS, who respectfully submits the following memorandum in Opposition to Debtor's Objection to Claim Number Six.

1.  **FACTS**

On or about October 15, 2007, in the Fifteenth Judicial District Court, bearing Docket Number 2007-1890, a Consent Judgment was rendered in favor of CHARLES GOSS against JOHN RAINES, in the amount of Seventy-five Thousand Dollars ($75,000.00). (See Exhibit "**A**"). The Judgment was rendered pursuant to a Petition on a promissory note, executed by JOHN RAINES, who at that time, was the spouse of MADLEN REBEKKEH RAINES, and upon information and belief, the indebtedness upon which CHARLES GOSS was granted the Judgment, was indebtedness of the community acquets and gains between JOHN RAINES and his spouse, MADLEN REBEKKEH RAINES.

Further, on or about January 6, 2009, Judgment was rendered, wherein it was ordered, adjudged, and decreed, that CHARLES GOSS be entitled to enforce the Judgment he holds against JOHN RAINES, against the earnings and other community assets in the possession of MADLEN REBEKKEH RAINES (See Exhibit "B").

On or about January 30, 2009, MADLEN REBEKKEH RAINES filed a voluntary Petition for Chapter 13 Plan, in the above referenced matter. Further, on or about July 24, 2009, through undersigned counsel, CHARLES GOSS filed a Proof of Claim in the above referenced matter. Finally, on or about July 28, 2009, MADLEN REBEKKEH RAINES, through undersigned counsel, filed an Objection to CHARLES GOSS's claim.

It is CHARLES GOSS's position that the indebtedness upon which CHARLES GOSS has the aforementioned Judgment, is the indebtedness of the community of acquets and gains between JOHN RAINES and MADLEN REBEKKEH RAINES and therefore, CHARLES

GOSS's claim in these bankruptcy proceedings should be honored.

2. **LAW AND ARGUMENT**

La.C.C. Article 2360 provides the following:

> An obligation incurred by a spouse during existence of a community property regime for the common interest of the spouses or for the interests of the other spouse is a community obligation.

La. C.C. Article 2346 provides the following:

> Each spouse acting alone may manage, control or dispose of community property unless otherwise provided by law.

La. C.C. Article 2361 provides the following:

> Except as provided in Article 2363, all obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations.

La. C.C. Article 2363 provides the following:

> A separate obligation of a spouse is one incurred by that spouse prior to the establishment of a community property regime, or one incurred during the existence of a community regime though not for the common interests of spouses or the interests of the other spouse. An obligation incurred after termination of a community property regime, except an obligation incurred for attorneys' fees and costs under Article 2362.1, is a separate obligation.

> An obligation resulting from an intentional wrong not perpetrated for the benefit of the community, or an obligation incurred for the separate property of a spouse to the extent that it does not benefit the community, family, or the other spouse, is likewise a separate obligation.

Based upon the above La. C.C. Articles, it is CHARLES GOSS's position that there is a presumption that the debt incurred during the marriage of JOHN RAINES and MADLEN REBEKKEH RAINES is a community obligation. Burden of overcoming community presumption falls upon the party who asserts that the disputed property is separate. *Morris v. Morris*, 685 So. 2d 673 (La. App. 3rd Cir. 1996), writ denied 690 So.2d 40, 1997-0237 (La. 3/14/97).

Also, in *Webb v. Pioneer Bank & Trust Co.*, 530 So.2d 115 (La. App. 2nd Cir. 1988), a wife sued to annul note and cancel mortgage and for damages from her former husband, who forged his wife's name and obtained a loan without his wife's knowledge or consent. The wife argued that the loan was the result of an "intentional wrong that was not perpetrated for the benefit of the community" and was thus a separate obligation of her husband's.

Bank records which were received into evidence, revealed that about half of the proceeds

were used to repay a community obligation and according to the bank records, the husband also used a substantial amount to purchase a money order for the one of the children of the marriage. The Court found that the fact that the loan was obtained without Plaintiff's knowledge or consent, does not affect its validity as a community obligation, since Plaintiff's consent was not required by the law. See *Louisiana Civil Code Article 2346, supra.* The Court further found that the evidence and the records supported the finding of the trial judge that the loan was incurred for the common interests of the spouses and benefitted the community. Therefore, the loan obtained and the promissory note executed by Plaintiff's former husband, even if fraudulently, was properly characterized as a community obligation. See *Ledet v. Ledet*, 496 So. 2d 381 (La. App. 4th Cir. 1986); *First Security Bank and Trust Co. v. Dooley*, 480 So.2d 842 (La. App. 2nd Cir. 1985).

With regard to the matter presently before this Honorable Court, JOHN RAINES' deposition was taken on February 9, 2009, in the divorce proceedings in the Fifteenth Judicial District Court, Parish of Lafayette, State of Louisiana, Docket Number 2009-0403. JOHN RAINES, under oath, testified that he borrowed Sixty Thousand Dollars ($60,000.00) from CHARLES GOSS on January 19, 2007, for the purpose of paying off outstanding debts that he had and to have some reserve built up that would help the family get started and back on track. (See Exhibit "C", Page 34 - 35, of deposition). Further, when asked to identify the debts he wished to pay off by borrowing the funds from Mr. Goss, JOHN RAINES testified that he wanted to get rid of the car note, wanted to pay off an outstanding American Express that "we had", and wanted to pay off "a whole bunch of things, and I paid off some, but not all." Further, JOHN RAINES identified the vehicle that was paid off was a Dodge Caravan 2003, which upon information and belief, is a community asset. (See Exhibit "D", Page 36 - 37, of deposition).

Also, JOHN RAINES testified that he kept some of the cash in the house, to pay off debts, which were paid in cash. He also testified that he gave his wife, MADLEN REBEKKEH RAINES, some cash and told her that it had come from his stepfather. He testified that he believes it was about Five Thousand Dollars ($5,000.00), and given to MADLEN REBEKKEH RAINES shortly after the January 2007 loan. (See Exhibit "E", Page 38 - 40, of deposition).

Further, JOHN RAINES testified that some of the money borrowed from Mr. Goss was used to pay his children's tuition. Mr. Raines also testified that the money used to pay the tuition

was deposited into a checking account, but he believes he also paid some of the tuition with cash. (See Exhibit "F", Page 43 - 44, of deposition).

Finally, JOHN RAINES also testified that he gave some of the money he received from Mr. Goss to his wife, put some cash into the savings account that he had, and put some cash into the checking account that he had. He also testified that some of the money from Goss was used to pay back a loan from Mr. Fuselier.

Therefore, assuming JOHN RAINES testifies in the proceedings before this Honorable Court as he did under oath in the aforementioned deposition, it is CHARLES GOSS's position that the indebtedness to CHARLES GOSS is the indebtedness of the community of acquets and gains and therefore is a community debt. Finally, CHARLES GOSS respectfully suggests to the Honorable Court that MADLEN REBEKKEH RAINES must prove that the indebtedness to CHARLES GOSS isn't a community debt and must do so by clear and convincing evidence. Based upon the above CHARLES GOSS respectfully request that this Honorable Court honor his claim in these proceedings.

Respectfully submitted,

BY: _____
KYLE SHERMAN, #24215
Attorney for Charles Goss
111 Mercury Street
Lafayette, LA 70503
(337) 237-7171

| | |
|---|---|
| CHARLES GOSS | 15TH JUDICIAL DISTRICT COURT |
| VERSUS | DOCKET NUMBER: 2007-1890 |
| JOHN RAINES | LAFAYETTE PARISH, LOUISIANA |

*******************************************************************************

## CONSENT JUDGMENT

NOW INTO COURT comes plaintiff, CHARLES GOSS, and defendant, JOHN RAINES, who stipulate to the following:

1. Charles Goss is the holder and owner of a promissory note (the "note"), which was signed in Lafayette Parish, Louisiana, made and subscribed by John Raines and made payable to the order of Charles Goss, in the original principal sum of SIXTY THOUSAND AND NO/100 ($60,000.00) DOLLARS, dated January 19, 2007, the original note being attached to the Petition on Promissory Note filed on April 13, 2007 in the above captioned and numbered cause.

2. Defendant, John Raines, owes plaintiff, Charles Goss, SIXTY THOUSAND AND NO/100 ($60,000.00) DOLLARS, with legal interest thereon from date of judicial demand until paid, plus all reasonable attorney's fees due and for all costs of these proceedings.

3. Defendant, John Raines, promised to pay the note no later than March 19, 2007.

4. Defendant, John Raines, failed to pay the note on or before March 19, 2007.

5. Defendant, John Raines, has agreed to pay plaintiff, Charles Goss, SEVENTY-FIVE THOUSAND AND NO/100 ($75,000.00) DOLLARS to conclude this matter.

The Court, having considered the pleadings, evidence and stipulations of parties,

IT IS ORDERED, ADJUDGED AND DECREED that defendant, John Raines, pay to Charles Goss the sum of SEVENTY-FIVE THOUSAND AND NO/100 ($75,000.00) DOLLARS, which represents the principal sum of $60,000.00 and legal interest and attorney's fees.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that each party is to bear its own costs.

**EXHIBIT A**

JUDGMENT READ AND SIGNED in Lafayette, Lafayette Parish, Louisiana, this 15 day of Oct, 2007.

_____
DISTRICT JUDGE

SUBMITTED BY:

_____
KYLE SHERMAN (#24215)
Attorney for Charles Goss
111 Mercury Street
Lafayette, Louisiana 70503
Telephone No. (337) 237-7171
Telefax No. (337) 237-9199

_____
John Raines
626 Buchanan Street
Lafayette, LA 70501

STATE OF LOUISIANA PARISH OF LAFAYETTE
I hereby certify that a certified copy of this judgment/order has been mailed/served on all parties this 16 day of Oct, 20 07
_____
Deputy Clerk of Court
cc: Kyle Sherman
    John Raines

FILED THIS 15
DAY OF Oct, 2007
_____
Deputy Clerk of Court

A TRUE COPY ATTEST
Lafayette, La. 10-15-07
_____
DY. CLERK OF COURT



| CHARLES GOSS | 15TH JUDICIAL DISTRICT COURT |
|---|---|
| VERSUS | DOCKET NUMBER: 2007-1890 |
| JOHN RAINES | LAFAYETTE PARISH, LOUISIANA |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### JUDGMENT

This matter came before the Court on the 5th day of January, 2009, for a hearing on a Rule to Show Cause why petitioner, CHARLES GOSS, should not be entitled to enforce the judgment he holds against JOHN RAINES, against the earnings and other community assets in the possession of REBEKKEH RAINES.

**PRESENT:** Kyle Sherman, Attorney at Law, appearing on behalf of Charles Goss.

The Court, having considered the Consent Judgment filed in the record, pleadings, and arguments of counsel, and due to the failure of Rebekkeh Raines appearing, despite service of process obtained on Rebekkeh Raines,

IT IS ORDERED, ADJUDGED AND DECREED that CHARLES GOSS be entitled to enforce the Judgment he holds against JOHN RAINES, against the earnings and other community assets in possession of REBEKKEH RAINES.

JUDGMENT READ AND SIGNED in Lafayette, Louisiana, this ___ day of _____, 2009.

_____
JUDGE DURWOOD CONQUE

Respectfully submitted:

BRANDT & SHERMAN, L.L.P.

_____
KYLE SHERMAN, #24215
Attorney for Charles Goss
111 Mercury Street
Lafayette, LA 70503
(337) 237-7171

STATE OF LOUISIANA PARISH OF LAFAYETTE
I hereby certify that a certified copy of this judgment/order has been mailed/served on all parties this 15 day of Jan, 20 09

_____
Deputy Clerk of Court

cc: Kyle Sherman
John Raines

EXHIBIT B

FILED THIS 8 DAY OF Jan, 20 09

A TRUE COPY ATTEST
Lafayette, La. 1-15-09

_____
DEPUTY CLERK OF COURT

### Page 33

1  the children after school and meals for
2  yourself, your wife, business associates,
3  potential clients?
4  A  Drinks, beer, Diet Cokes, Cokes,
5  cigarettes, just wasteful stuff.
6  Q  Could you estimate how much money you
7  believe you have "squandered," to use
8  your word, your term, over the course of
9  your marriage to Rebekke?
10 A  A great deal of money. I do not -- I
11 cannot even begin to estimate it, I could
12 not.
13 Q  Would it be over $10,000?
14 A  Yes, ma'am.
15 Q  Would it be over $20,000?
16 A  Yes, ma'am.
17 Q  Does it include putting a swimming pool
18 in at the house at 2301 W. St. Mary?
19 A  No, that was a decision that we both
20 made.
21 Q  Does it -- would it be over $30,000?
22 A  I'm sure, yes, ma'am.
23 Q  Over $40,000?
24 A  Yes, ma'am, it probably goes as high as
25 $100,000.

### Page 34

1  Q  Can you identify any particular item,
2  asset, piece of property that you
3  acquired for this estimated sum of
4  $100,000?
5  A  No, ma'am.
6  Q  Do you have any other promissory notes or
7  IOUs that you have brought today?
8  A  This is the -- that is it.
9  Q  And in the course of the 1993 to 2009
10 period of time in which you were married
11 to Rebekke, did you execute any
12 promissory notes that we have not
13 discussed today?
14 A  Yes, ma'am.
15 Q  Could you please identify to whom these
16 notes were written?
17 A  I exercised a promissory note to Charles
18 Goss and that is the subject of a lawsuit
19 and it is still outstanding.
20 Q  And is that a document that would
21 evidence a debt?
22 A  Yes, ma'am.
23 Q  Do you have a copy of the promissory
24 note?
25 A  I have a copy of the copy.

### Page 35

1  Q  Are you the only signator on that note?
2  A  Yes, ma'am.
3  Q  And how much was that note for?
4  A  $60,000.
5  Q  And do you have a record of any payments
6  that you made toward that note?
7  A  No, ma'am.
8  Q  When did you borrow the $60,000 from Mr.
9  Goss?
10 A  January 19th, 2007.
11 Q  Do you recall the purpose for which you
12 borrowed this money?
13 A  Yes, I had -- I owed money, and thought
14 if I borrowed money from Mr. Goss, I
15 would pay off the outstanding debts that
16 I had and have some reserve built up that
17 would help the family get started and
18 back on track.
19 Q  Who is Mr. Goss?
20 A  Mr. Goss is a man that I know, a very
21 kindly gentleman that came into the
22 office one day and I did some work with
23 him over a period of a couple of years
24 when I was with the City.
25 Q  So, he went into your City office?

### Page 36

1  A  Yes, ma'am.
2  Q  And you borrowed money from him?
3  A  This was not when I was employed with the
4  City.
5  Q  I understand. You still borrowed money
6  from him?
7  A  This was years later. I had met him
8  years before.
9  Q  Could you please identify the debts that
10 you wished to pay off by borrowing, did
11 you say $60,000, from Mr. Goss?
12 A  Yes, ma'am.
13 Q  What debts did you want to pay off?
14 A  I wanted to get rid of the car note. I
15 wanted to pay off an outstanding American
16 Express that we had. I wanted to pay off
17 a whole bunch of things, and I paid off
18 some, but not all.
19 Q  Do you have any records that would
20 reflect your payment of an American
21 Express balance?
22 A  No, ma'am.
23 Q  Do you have any record that would reflect
24 payment of a car note?
25 A  No, ma'am.

9 (Pages 33 to 36)



Page 33

1   the children after school and meals for
2   yourself, your wife, business associates,
3   potential clients?
4  A  Drinks, beer, Diet Cokes, Cokes,
5   cigarettes, just wasteful stuff.
6  Q  Could you estimate how much money you
7   believe you have "squandered," to use
8   your word, your term, over the course of
9   your marriage to Rebekke?
10 A  A great deal of money. I do not -- I
11   cannot even begin to estimate it, I could
12   not.
13 Q  Would it be over $10,000?
14 A  Yes, ma'am.
15 Q  Would it be over $20,000?
16 A  Yes, ma'am.
17 Q  Does it include putting a swimming pool
18   in at the house at 2301 W. St. Mary?
19 A  No, that was a decision that we both
20   made.
21 Q  Does it -- would it be over $30,000?
22 A  I'm sure, yes, ma'am.
23 Q  Over $40,000?
24 A  Yes, ma'am, it probably goes as high as
25   $100,000.

Page 34

1  Q  Can you identify any particular item,
2   asset, piece of property that you
3   acquired for this estimated sum of
4   $100,000?
5  A  No, ma'am.
6  Q  Do you have any other promissory notes or
7   IOUs that you have brought today?
8  A  This is the -- that is it.
9  Q  And in the course of the 1993 to 2009
10   period of time in which you were married
11   to Rebekke, did you execute any
12   promissory notes that we have not
13   discussed today?
14 A  Yes, ma'am.
15 Q  Could you please identify to whom these
16   notes were written?
17 A  I exercised a promissory note to Charles
18   Goss and that is the subject of a lawsuit
19   and it is still outstanding.
20 Q  And is that a document that would
21   evidence a debt?
22 A  Yes, ma'am.
23 Q  Do you have a copy of the promissory
24   note?
25 A  I have a copy of the copy.

Page 35

1  Q  Are you the only signator on that note?
2  A  Yes, ma'am.
3  Q  And how much was that note for?
4  A  $60,000.
5  Q  And do you have a record of any payments
6   that you made toward that note?
7  A  No, ma'am.
8  Q  When did you borrow the $60,000 from Mr.
9   Goss?
10 A  January 19th, 2007.
11 Q  Do you recall the purpose for which you
12   borrowed this money?
13 A  Yes, I had -- I owed money, and thought
14   if I borrowed money from Mr. Goss, I
15   would pay off the outstanding debts that
16   I had and have some reserve built up that
17   would help the family get started and
18   back on track.
19 Q  Who is Mr. Goss?
20 A  Mr. Goss is a man that I know, a very
21   kindly gentleman that came into the
22   office one day and I did some work with
23   him over a period of a couple of years
24   when I was with the City.
25 Q  So, he went into your City office?

Page 36

1  A  Yes, ma'am.
2  Q  And you borrowed money from him?
3  A  This was not when I was employed with the
4   City.
5  Q  I understand. You still borrowed money
6   from him?
7  A  This was years later. I had met him
8   years before.
9  Q  Could you please identify the debts that
10   you wished to pay off by borrowing, did
11   you say $60,000, from Mr. Goss?
12 A  Yes, ma'am.
13 Q  What debts did you want to pay off?
14 A  I wanted to get rid of the car note. I
15   wanted to pay off an outstanding American
16   Express that we had. I wanted to pay off
17   a whole bunch of things, and I paid off
18   some, but not all.
19 Q  Do you have any records that would
20   reflect your payment of an American
21   Express balance?
22 A  No, ma'am.
23 Q  Do you have any record that would reflect
24   payment of a car note?
25 A  No, ma'am.

9 (Pages 33 to 36)

John Raines

1  Q  What car did you have a note on?
2  A  It's a Dodge Caravan 2003, maybe.
3  Q  Was this vehicle financed through the
4     dealership?
5  A  Yes, ma'am, I don't have one. I'm sure I
6     could get a copy from the Capital Bank,
7     but no, I don't have one with me.
8  Q  Did you do your financing through Capital
9     Bank?
10 A  Yes, ma'am.
11 Q  I would like to see a copy of that note
12    along with proof of the cancellation of
13    the note. You did say that you paid off
14    the note, did I understand that
15    correctly?
16 A  Yes, ma'am, and the cancellation I have
17    at the house.
18 Q  We would like to see it. Have you --
19    since the time you've paid off this note
20    on your vehicle, have you placed another
21    lien on the vehicle and used it as
22    security to borrow any money?
23 A  No, ma'am.
24 Q  What do you estimate the note on your van
25    was, the balance due?

Page 38

1  A  The balance due at that time?
2  Q  Uh-huh (yes).
3  A  Probably $3,000.
4  Q  Okay. And you indicated that you also
5     paid off an American Express card. Did
6     you pay off the balance in full?
7  A  I think so, yes, ma'am.
8  Q  And what was that balance?
9  A  It was around $4,000.
10 Q  Around $4,000, which would leave $53,000
11    remaining on the money that you borrowed
12    from Mr. Goss.
13 A  Yes, and I kept some cash in the house,
14    my wife and I. I paid off -- I had debts
15    everywhere at that time -- I paid off
16    things left and right. I don't remember
17    everything that was done.
18 Q  Did you pay off these debts in cash?
19 A  Yes, ma'am.
20 Q  Did Mr. Goss give you a check or did he
21    give you cash?
22 A  He gave me a check, actually, he gave me
23    two checks.
24 Q  Into which account did you deposit these
25    two checks?

Page 39

1  A  Into an Iberia Bank savings account.
2  Q  Do you happen to have the account number
3     on you?
4  A  No, ma'am, that account has been closed.
5  Q  Do you have any of the bank statements?
6  A  No, ma'am.
7  Q  Can you obtain those bank statements?
8  A  I'm sure I can.
9  Q  Other than the American Express and the
10    vehicle, do you recall any other
11    particular specific creditor that you
12    paid off with this remaining $53,000?
13 A  No, ma'am.
14 Q  Did you discuss borrowing $60,000 from
15    Mr. Goss with anyone?
16 A  No, ma'am.
17 Q  And did you discuss saving money in your
18    -- putting money away in your house with
19    anyone?
20 A  I gave my wife, Madlen Rebekke Raines,
21    some cash and told her that it had come
22    from my stepfather.
23 Q  How much cash was that?
24 A  I wouldn't swear by it, but I want to say
25    $5,000.

Page 40

1  Q  Do you recall the time period in which
2     you obtained this money and gave $5,000
3     to Rebekke Raines?
4  A  It was shortly after the January 2007.
5  Q  Mr. Raines has handed me, please let the
6     record reflect, a Notice of Signing of
7     Judgment with a Lafayette Parish
8     recording page, a Consent Judgment in the
9     matter under Docket No. 2007-1890 with
10    attached correspondence and a Petition on
11    a Promissory Note, again, with an exhibit
12    attached to this petition. Mr. Raines,
13    is this your only copy?
14 A  I think so, but you are certainly more
15    than welcome to make a copy of it.
16 Q  What I'd like for you to do, Mr. Raines,
17    in an attempt to authenticate this
18    document, would be if you could please
19    initial and number each page including
20    the exhibit pages and we'd attach this as
21    "Exhibit 7." Thank you. Mr. Raines,
22    were you represented by an attorney in
23    this legal matter that we just discussed
24    with Mr. Goss?
25 A  Eventually, yes.

10 (Pages 37 to 40)

CYNDA STIRLING WENTWORTH
CERTIFIED COURT REPORTER    337.984.8102

101 TEZCUCO COURT
LAFAYETTE, LA 70503

Page 37

1  Q  What car did you have a note on?
2  A  It's a Dodge Caravan 2003, maybe.
3  Q  Was this vehicle financed through the
4     dealership?
5  A  Yes, ma'am, I don't have one. I'm sure I
6     could get a copy from the Capital Bank,
7     but no, I don't have one with me.
8  Q  Did you do your financing through Capital
9     Bank?
10 A  Yes, ma'am.
11 Q  I would like to see a copy of that note
12    along with proof of the cancellation of
13    the note. You did say that you paid off
14    the note, did I understand that
15    correctly?
16 A  Yes, ma'am, and the cancellation I have
17    at the house.
18 Q  We would like to see it. Have you --
19    since the time you've paid off this note
20    on your vehicle, have you placed another
21    lien on the vehicle and used it as
22    security to borrow any money?
23 A  No, ma'am.
24 Q  What do you estimate the note on your van
25    was, the balance due?

Page 38

1  A  The balance due at that time?
2  Q  Uh-huh (yes).
3  A  Probably $3,000.
4  Q  Okay. And you indicated that you also
5     paid off an American Express card. Did
6     you pay off the balance in full?
7  A  I think so, yes, ma'am.
8  Q  And what was that balance?
9  A  It was around $4,000.
10 Q  Around $4,000, which would leave $53,000
11    remaining on the money that you borrowed
12    from Mr. Goss.
13 A  Yes, and I kept some cash in the house,
14    my wife and I. I paid off -- I had debts
15    everywhere at that time -- I paid off
16    things left and right. I don't remember
17    everything that was done.
18 Q  Did you pay off these debts in cash?
19 A  Yes, ma'am.
20 Q  Did Mr. Goss give you a check or did he
21    give you cash?
22 A  He gave me a check, actually, he gave me
23    two checks.
24 Q  Into which account did you deposit these
25    two checks?

Page 39

1  A  Into an Iberia Bank savings account.
2  Q  Do you happen to have the account number
3     on you?
4  A  No, ma'am, that account has been closed.
5  Q  Do you have any of the bank statements?
6  A  No, ma'am.
7  Q  Can you obtain those bank statements?
8  A  I'm sure I can.
9  Q  Other than the American Express and the
10    vehicle, do you recall any other
11    particular specific creditor that you
12    paid off with this remaining $53,000?
13 A  No, ma'am.
14 Q  Did you discuss borrowing $60,000 from
15    Mr. Goss with anyone?
16 A  No, ma'am.
17 Q  And did you discuss saving money in your
18    -- putting money away in your house with
19    anyone?
20 A  I gave my wife, Madlen Rebekke Raines,
21    some cash and told her that it had come
22    from my stepfather.
23 Q  How much cash was that?
24 A  I wouldn't swear by it, but I want to say
25    $5,000.

Page 40

1  Q  Do you recall the time period in which
2     you obtained this money and gave $5,000
3     to Rebekke Raines?
4  A  It was shortly after the January 2007.
5  Q  Mr. Raines has handed me, please let the
6     record reflect, a Notice of Signing of
7     Judgment with a Lafayette Parish
8     recording page, a Consent Judgment in the
9     matter under Docket No. 2007-1890 with
10    attached correspondence and a Petition on
11    a Promissory Note, again, with an exhibit
12    attached to this petition. Mr. Raines,
13    is this your only copy?
14 A  I think so, but you are certainly more
15    than welcome to make a copy of it.
16 Q  What I'd like for you to do, Mr. Raines,
17    in an attempt to authenticate this
18    document, would be if you could please
19    initial and number each page including
20    the exhibit pages and we'd attach this as
21    "Exhibit 7." Thank you. Mr. Raines,
22    were you represented by an attorney in
23    this legal matter that we just discussed
24    with Mr. Goss?
25 A  Eventually, yes.

10 (Pages 37 to 40)

CYNDA STIRLING WENTWORTH                                    101 TEZCUCO COURT
CERTIFIED COURT REPORTER            337.984.8102            LAFAYETTE, LA 70503



**Page 41**

1  Q   And who was your attorney?
2  A   Lester Gauthier.
3  Q   And did Mr. Gauthier charge you a fee for
4      representing you?
5  A   $500.
6  Q   And how did you pay him?
7  A   Cash.
8  Q   Where did the money come from?
9  A   It's part of the money that I had put
10     into a savings account that I had had for
11     a couple of years and had the money in
12     the account. I took it out of there.
13 Q   What savings account is that?
14 A   It's with Chase.
15 Q   Chase, is the account in your name alone?
16 A   Yes, ma'am.
17 Q   Do you have any documents that indicate
18     the account number for that savings
19     account?
20 A   Yes, ma'am.
21 Q   May I see that, please?
22 A   Yes, ma'am.
23 Q   Would you agree that this is Account No.
24     2902823224 at Chase Bank?
25 A   Yes, ma'am.

**Page 42**

1  Q   And it is held in the name John R.
2      Raines; is that correct?
3  A   Yes, ma'am.
4  Q   Do you recall when you opened this
5      account, Mr. Raines?
6  A   No, I do not, I'm sorry.
7  Q   Did you open the account after you
8      married Rebekke?
9  A   Yes, ma'am.
10 Q   And did you open the account after you
11     left the Consolidated Government
12     employment?
13 A   Yes, ma'am.
14 Q   Did you open this account before you left
15     Neel-Schaffer?
16 A   I'm not sure.
17 Q   Do you recall if the account was opened
18     at any time when you were spending a lot
19     of your time in the Northwest Mississippi
20     project?
21 A   I'd have to find out when that was, I
22     don't recall.
23 Q   Can you do that for us, please? Would
24     you agree to provide copies of your
25     statements from the date of inception of

**Page 43**

1      the account, and this appears to be an
2      account that is dated through January 23,
3      2009; could you please provide us with
4      those statements?
5  A   Yes, ma'am.
6  Q   Thank you very much. I would like to
7      introduce this as "Exhibit No. 8," and
8      would you please initial this, thank you?
9      Thanks very much. Did any of the money
10     that you borrowed from Mr. Goss go to pay
11     your children's tuition or educational
12     expenses?
13 A   Yes.
14 Q   Can you tell me how much of that money
15     went to pay those expenses?
16 A   I don't recall. When I had the cash,
17     there were -- it would have been put into
18     the checking account and used to pay the
19     kids' -- the children's tuition. A
20     specific, direct, line item transfer, no.
21 Q   And you said that it would be put into
22     the account; is that a checking account
23     that you described?
24 A   Yes, ma'am.
25 Q   What is the name on that checking

**Page 44**

1      account?
2  A   This is -- well, at that time --
3  Q   Could you be specific and tell me what
4      you mean by "at that time"?
5  A   In January of 2007, I don't recall if my
6      wife and I had two separate accounts or
7      just one.
8  Q   In which account would you have placed
9      the money if there were two accounts?
10 A   In mine.
11 Q   Would you have --
12 A   If we had two.
13 Q   Would you have paid the tuition by a
14     check from that account?
15 A   Yes, ma'am.
16 Q   Did you ever pay the tuition with cash?
17 A   I think so. I would not swear to that, I
18     might have, I don't recall.
19 Q   Do you have any other documents that name
20     other creditors?
21 A   No. The only other thing that I had that
22     I thought you requested was a copy of the
23     checking account statement -- no? Too
24     early?
25 Q   I will get to that in just a second,

11 (Pages 41 to 44)

CYNDA STIRLING WENTWORTH                                    101 TEZCUCO COURT
CERTIFIED COURT REPORTER        337.984.8102                LAFAYETTE, LA 70503

